**WO**

# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| ZombieBox International Incorporated, | No. CV-23-00726-PHX-ROS |
| Plaintiff, | **ORDER** |
| v. | |
| Generac Power Systems Incorporated, | |
| Defendant. | |

Plaintiff ZombieBox International Inc. produces a noise-reducing enclosure for portable and standby generators.  (Doc. 10, "SAC" at ¶ 7).  Defendant Generac Power Systems Inc. is "one of the largest manufactures of generators in the world."  *Id.* at ¶ 16.  Plaintiff alleges Defendant defamed and organized a group boycott of Plaintiff and its products, harming its business. *See generally id*.  Defendant seeks dismissal of the Second Amended Complaint (Doc. 11, "Mot.") and judicial notice of Plaintiff's website (Doc. 13).  But the Complaint contains sufficient allegations to require an answer and judicial notice is not proper.

## I.      BACKGROUND

Plaintiff alleges the following facts in the Complaint.   Plaintiff developed a "revolutionary, patented noise reducing enclosure for portable and standby generators" called a "ZombieBox."   SAC at ¶¶ 7–10.   After considerable testing, which found any impact on the internal temperature of generators was negligible, Plaintiff began selling its products in 2016 and experienced rapid growth.  *Id*. at ¶¶ 11–14.  Defendant, "one of the

largest manufacturers of generators in the world," approached Plaintiff about a potential partnership between the companies involving collaborative testing and product design. *Id.* at ¶ 16. These discussions eventually "fizzled out." *Id.* at ¶ 19. Soon after, Defendant "started making false and defamatory statements to distributors and customers," claiming Plaintiff's ZombieBox product "is dangerous, damages the generators it houses, and voids a generator's warranty." *Id.* at ¶¶ 21–22. Despite extensive testing, more than seven years in business, and "thousands of units sold, Plaintiff has never received a complaint about the safety of its ZombieBox" product. *Id.* at ¶¶ 30–32. At Defendant's annual dealer conference in January 2023, Defendant referred to the ZombieBox product as a "generator murder box," showed pictures of a damaged generator, "reiterated its claims that ZombieBoxes are dangerous, damage generators, and void warranties," and "told distributors that if they continued to hold or sell ZombieBoxes, Defendant would stop working with those distributors." *Id.* at ¶¶ 35–40. After the conference, at least 36 distributors "stopped carrying and ordering ZombieBoxes" with several more likely to follow suit. *Id.* at ¶¶ 44–48. In addition to distributors, several customers have elected not to do business with Plaintiff because Defendant labeled Plaintiff's products as dangerous and voiding generator warranties. *Id.* at ¶¶ 53–61. "The resulting decline in Plaintiff's business has been precipitous," with sales dropping "significantly each year." *Id.* at ¶¶ 62–63.

## II.    MOTION FOR JUDICIAL NOTICE

Defendant asks the Court to take judicial notice of Plaintiff's website, specifically an FAQ page indicating the use of ZombieBox enclosures may void a generator's warranty. (Doc. 13). Defendant claims this statement is relevant because Plaintiff alleges "the substantially same statement—when made by [Defendant]—constitutes defamation, trade libel, false advertising and tortious interference." *Id.* at 2. Plaintiff argues the Court should not judicially notice this statement because it is "neither factually verifiable nor relevant to this case." (Doc. 15 at 1).

Federal Rule of Evidence 201 allows courts to judicially notice facts "not subject to

1   reasonable dispute because" they (1) are "generally known within the trial court's territorial

2   jurisdiction;" or (2) "can be accurately and readily determined from sources whose

3   accuracy cannot be reasonably questioned."

4        Defendant offers virtually no authority to bolster its argument in favor of judicial

5   notice, citing only one unpublished case stating courts may judicially notice non-

6   governmental websites in certain circumstances.  (Doc. 13 at 2).  Defendant's argument is

7   not persuasive.  In the case Defendant cites, the judicially noticed websites were the direct

8   subject of the trademark infringement claims at issue in the case.  *See ACI L. Grp. PLLC*

9   *v. ACI L. Grp. PC*, No. 21-CV-0098, 2021 WL 4263692, at *11 (D. Ariz. Sept. 20, 2021).

10       Plaintiff, on the other hand, cites several applicable cases finding judicial notice of

11  parties' websites improper because they are often unhelpful, irrelevant, unverifiable, or not

12  incorporated into the complaint.   (Doc. 15 at 2); *see, e.g.*, *ThermoLife Inter. LLC v.*

13  *Neogenis Labs Inc.*, No. 18-CV-2980, 2021 WL 1400818, at * 2 (D. Ariz. April 14, 2021)

14  (declining to judicially notice non-movant's website containing statements purportedly

15  contradicting its theory of liability), *Salazar v. Driver Provider Phoenix LLC*,

16  No. 19-CV-5760, 2020 WL 5748129, *4 (D. Ariz. Sept. 24, 2020) (declining to judicially

17  notice non-movant's website where it was neither incorporated into the complaint nor the

18  genesis of the claims at issue).  Plaintiff's website is not incorporated into the Complaint

19  and does not serve as the genesis of Plaintiff's claims.  The website does not meet the high

20  bar for judicial notice and Defendant's motion will be denied.

21  ### III.    MOTION TO DISMISS

22       A complaint must set forth a "short and plain statement of the claim showing that

23  the pleader is entitled to relief."  Fed. R. Civ. P. 8(a)(2).  "To survive a motion to dismiss,

24  a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to

25  relief that is plausible on its face.'"  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting

26  *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (internal citations omitted)).  If "the

27  well-pleaded facts do not permit the court to infer more than the mere possibility of

28  misconduct, the complaint" has not adequately shown the pleader is entitled to relief.  *Id.*

at 679.  Although federal courts ruling on a motion to dismiss "must take all of the factual allegations in the complaint as true," they "are not bound to accept as true a legal conclusion couched as a factual allegation." *Id.* at 678 (quoting *Twombly*, 550 U.S. at 555) (internal quotations omitted).

Plaintiff's Complaint alleges six causes of action against Defendant: (1) defamation; (2) trade libel or commercial disparagement; (3) wrongful interference with existing and prospective contractual relations; (4) false advertising under the Lanham Act; (5) unfair competition and false advertising under Arizona law; and (6) restraint of trade under the Sherman Act.

### A.    Defamation & Trade Libel (Counts I and II)

Counts I and II of Plaintiff's Complaint allege defamation and trade libel, respectively.  In Arizona, defamation requires: (1) a false statement; (2) published to a third party; where (3) the defendant (a) knew the statement was false and defamatory or (b) recklessly disregarded or negligently failed to ascertain the truth or defamatory nature of the statement.  *Dube v. Likins*, 167 P.3d 93, 104 (Ariz. Ct. App. 2007).  A complaint that lists "the precise statements alleged to be false and defamatory, who made them and when" is sufficient to survive a motion to dismiss.  *Stoyanof v. Crocodiles Not Waterlillies, L.L.C.*, No. 11-CV-0384, 2011 WL 13232088, at *5 (D. Ariz. June 23, 2011) (quoting *Flowers v. Carville*, 310 F.3d 1118, 1131 (9th Cir. 2002)).

Trade libel, also referred to as commercial or product disparagement, is similar to defamation and often analyzed under the same standard.  *See, e.g.*, *Atlatl Group LLC v. Unknown Parties*, No. 20-CV-1199, 2023 WL 2396100, at *3 (D. Ariz. Mar. 22, 2023); *Luxury Auto Collection LLC v. Walker*, No. 21-CV-2025, 2022 WL 17361292, at *5 (D. Ariz. July 6, 2022); 9B Ariz. Prac., Business Law Deskbook § 33:6 (2023–2024 ed.) ("Claims for product disparagement or 'trade libel' are subject to the same First Amendment requirements that govern defamation actions.").  The elements of a trade libel claim in Arizona are: (1) intentional publication; (2) of an injurious falsehood; (3) disparaging the quality of another's property; (4) resulting in pecuniary loss.  *Gee v.*

*Pima Cnty.*, 612 P.2d 1079, 1079 (Ariz. Ct. App. 1980).

The Court can analyze Plaintiff's defamation and trade libel claims together because the subjects of both claims are the same statements allegedly made by Defendant about Plaintiff's products. The Complaint alleges three instances of defamatory or libelous statements (i) containing assertions that either using Plaintiff's ZombieBox product voids a generator's warranty; or (ii) labeling the ZombieBox product a "generator murder box," attributing a generator's heat damage to use of a ZombieBox, and telling dealers ZombieBoxes are dangerous, damage generators, and void warranties at the 2023 Dealer Conference. *See* SAC at ¶¶ 28, 35–41, 58, 66. Defendant argues Plaintiff does not provide sufficient details of the alleged defamatory statements made at the 2023 Dealer Conference to put Defendant on notice of the allegations to "adequately defend itself." Mot. at 11–12. Defendant claims the Complaint does not allege "details of who made these purported statements, to whom the statements were made, or how they were made." *Id.* at 12. Plaintiff responds by pointing out each alleged defamatory statement includes the "speaker, a recipient, the substance of the communication, and the time when it occurred." Resp. at 4.

Defendant argues it needs to know the exact individual that made the statements to be put on notice of the basis for Plaintiff's claims. *See* Mot. at 11–12. The Court is not persuaded. Plaintiff alleges Defendant made several specific statements at the 2023 Dealer Conference, the precise dates and location of the conference, and the names of several distributors who were at the presentation. SAC at ¶¶ 35–41, 66. Plaintiff has provided sufficient detail of the statements made at the 2023 Dealer Conference to state a claim. Defendant's motion as to Counts I and II will be denied.

Defendant further argues Plaintiff does not claim Defendant's statements concerning its warranty are false, and even if it did, the statements are not defamatory because they do not bring Plaintiff into "disrepute, contempt, or ridicule" or "impeach its honesty, integrity, virtue, or reputation." Mot. at 10–11. In effect, Defendant argues that some of the statements identified in the Complaint as supporting the defamation claims are

not viable bases for such claims.  While this argument may have merit, the Court need not reach this question since Plaintiff has alleged sufficient facts to support its defamation claim with Defendant's alleged statements at the 2023 Dealer Conference.

**B.      Wrongful Interference with Existing and Prospective Contractual Relations (Count III)**

Count III of the Complaint alleges wrongful interference with existing and prospective contractual relations.  Wrongful interference has five elements under Arizona law: (1) the existence of a valid contractual relationship or business expectancy; (2) defendant's knowledge of the relationship or expectancy; (3) defendant's intentional interference in inducing or causing the breach; (4) defendant's interference must be improper; and (5) resulting damages.  *Health Indus. Bus. Commc'ns Council Inc. v. Animal Health Inst.*, 481 F. Supp. 3d 941, 958 (D. Ariz. 2020) (quoting *MDY Indus., LLC v. Blizzard Entertainment, Inc.*, 629 F.3d 928, 955 (9th Cir. 2010)).

The Complaint identifies several instances of Defendant's alleged interference, asserting Defendant interfered with Plaintiff's prospective business relationships with four distributors and two individual customers.  SAC ¶¶ 88, 91–92.  Specifically, Plaintiff claims Defendant referred to the ZombieBox product as "a casket for your generator" to a prospective buyer; told "dealers that it will stop working with them if they continue to work with [Plaintiff];" and told prospective customers Degryse Electric, Sonia DeGeulle, and someone named "Shane" that using a ZombieBox would void Defendant's warranty.  *Id.* at 88.  The Complaint further alleges "Plaintiff had existing and ongoing relationships with several dealers that completely stopped ordering Plaintiff's products because of Defendant's interference."  *Id.* at ¶ 90.

Defendant argues Plaintiff "does not identify any specific person or entity to whom" Defendant made statements about "stopping work with the dealers if they work with [Plaintiff]" and fails to allege Defendant "knowingly made those statements to entities with whom [Plaintiff] had a reasonable expectancy of a business relationship or that any such entities ceased doing business with [Plaintiff] as a result."  Mot. at 13–14.

Plaintiff responds by pointing out the Complaint identifies not only which dealers had representatives present at the Dealer Conference where Defendant made these statements, but the names of the individual representatives.  Resp. at 6, SAC at ¶ 41.  The Complaint alleges Degryse Electric—one of the dealers present at the conference—had asked Defendant about Plaintiff's products, SAC at ¶ 50, 66, which Plaintiff argues shows "Defendant knew Plaintiff had at least a prospective business relationship with Degryse Electric," Resp. at 6.  The Complaint closes the loop by alleging Degryse Electric, along with a plethora of other dealers and customers, "stopped carrying and ordering ZombieBoxes."  SAC at ¶ 44.  Construed in  the light most favorable to Plaintiff, these allegations are sufficient to state a claim against Defendant for knowingly interfering with Plaintiff's business expectancy with Degryse Electric.

Defendant further argues Plaintiff has not shown "any specific interfering conduct" by Defendant directed toward Schultz Miller, Generator Supercenter, and LT Generators. *Id.* at 14.  Because Plaintiff has successfully pled interference with Degryse Electric, Plaintiff need not rely on interference with any of these three entities to state its claim.  And the Complaint does specifically detail the alleged interfering conduct with Generator Supercenter—who "shut off all communication" with Plaintiff "shortly after [Defendant] started to defame" it and whose Chief Business Officer told Plaintiff "Defendant was not okay with Generator Supercenter working with Plaintiff." SAC at ¶ 45.

Finally, Defendant argues its alleged statements about its warranty policies are not "false, deceptive, or improper," but stops short of arguing its alleged statements about "stopping work with the dealers if they work with [Plaintiff]" are proper.  Mot at 14.  Plaintiff has sufficiently stated a wrongful interference claim independent of Defendant's alleged statements concerning its warranty.  Thus, the Court need not decide whether the warranty-related statements on their own would be sufficient to support a wrongful interference claim.

Plaintiff may not have alleged sufficient facts to show these business expectancies "in all probability would have been completed" without Defendant's interference, *see Wolf*

*Designs LLC v. Five 18 Designs LLC*, 635 F. Supp. 3d 787, 798 (D. Ariz. 2022) (internal citation omitted), but Defendant did not argue this issue in its motion.  Thus, Defendant's motion as to Count III will be denied.

### C.    False Advertising & Unfair Competition (Counts IV and V)

Counts IV and V of the Complaint allege False Advertising under the Lanham Act and Unfair Competition through False Advertising under Arizona law, respectively.

Section 43 of the Lanham Act prohibits misrepresenting "another person's goods, services, or commercial activities" in "commercial advertising or promotion."  15 U.S.C. § 1125(a)(1)(B).  The Ninth Circuit defines "commercial advertising or promotion" as: "(1) commercial speech, (2) by a defendant who is in commercial competition with plaintiff, (3) for the purpose of influencing consumers to buy defendant's goods or services, and (4) that is sufficiently disseminated to the relevant purchasing public."  *Ariix, LLC v. NutriSearch Corp.*, 985 F.3d 1107, 1115 (9th Cir. 2021) (citing *Coastal Abstract Serv., Inc. v. First Am. Title Ins. Co.*, 173 F.3d 725, 735 (9th. Cir. 1999)).[1]

In Arizona, state law unfair competition claims and Lanham Act false advertising claims "share the same analysis."  *Thermolife Int'l, L.L.C. v. NeoGenis Labs, Inc.*, No. 18-CV-2980, 2019 WL 1438293, at *7 (D. Ariz. Apr. 1, 2019).  Thus, the Court will analyze Counts IV and V together.

Defendant's motion argues its alleged conduct does not constitute "commercial advertising or promotion" under the Lanham Act.  Mot. at 7–9.  Defendant first claims Plaintiff did not allege Defendant made these statements for the purpose of influencing consumers to buy Defendant's products.  Plaintiff argues its Complaint alleges Defendant made these statements in the context of a promotional dealer conference or to inquiring customers and "had the intended effect of influencing consumers" to purchase Defendant's

---

[1] The *Ariix* Court, while acknowledging the Supreme Court's decision in *Lexmark* likely abrogated the second element—requiring the defendant and plaintiff to be in commercial competition with one another—did not remove it from the elements list.  985 F.3d at 1120 (citing *Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 572 U.S. 118, 134 (2014)). Because Defendant does not argue this element as part of its motion to dismiss, Mot. at 7, the Court assumes without deciding Plaintiff need not satisfy this element.

generators.  (Doc. 12 at 13).  But Plaintiff's Complaint falls short of alleging Defendant made the alleged statements for the purpose of influencing consumers to buy Defendant's products.  The Complaint alleges "Defendant's false claims eroded Plaintiff's goodwill among consumers and caused Plaintiff's customers and prospective customers to cease doing business with Plaintiff," who, "[i]nstead . . . chose Defendant's generators with competing in-house enclosures."  SAC at ¶¶ 105–06.  While Plaintiff certainly alleges the *effect* of Defendant's statements, it does not allege the *purpose* of these statements was to promote Defendant's own products.  Contrary to its argument in its Response, Plaintiff's only allegation related to Defendant's "intended effect" in making the relevant statements is that "Defendant intended that it deceive the target audience."  SAC at ¶ 102.  But the alleged intent to deceive Plaintiff references is immaterial to the "commercial advertising or promotion" analysis.  Plaintiff has not adequately alleged Defendant made these statements for the purpose of influencing customers to buy Defendant's products.  Thus, Plaintiff has failed to state a false advertising claim.

Defendant further argues it did not sufficiently disseminate its alleged statements to the relevant purchasing public to constitute advertising or promotion.  Mot. at 8.  Plaintiff responds by outlining the setting of Defendant's alleged statements, arguing statements made online, directly to customers and distributors, and a promotional dealer conference are not isolated incidents but part of "a widespread disinformation campaign."  (Doc. 12 at 11–12).  Plaintiff is likely correct that it has alleged Defendant sufficiently disseminated the statements, but the Court need not reach that issue in light of the finding that Defendant's statements did not meet the definition of "commercial advertising or promotion."

Defendant's motion with respect to Plaintiff's false advertising claims (Counts IV and V) will be granted, but Plaintiff will have leave to amend.

### D.  Antitrust (Count VI)

Count VI of the Complaint alleges a restraint of trade in violation of Section 1 of the Sherman Act.  SAC at ¶¶ 123–36.  Section 1 of the Sherman Act proscribes "[e]very

contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States, or with foreign nations, is declared to be illegal." 15 U.S.C. § 1.  Of course, virtually all commercial contracts are "restraints of trade" by limiting the economic freedom of the parties, so the Supreme Court has long recognized "the Sherman Act was intended to prohibit only *unreasonable* restraints of trade."  *Nat'l Collegiate Athletic Ass'n v. Bd. of Regents of Univ. of Oklahoma*, 468 U.S. 85, 98 (1984) (emphasis added).

A cause of action under Section 1 consists of the following elements: (1) an agreement between two or more entities; (2) an unreasonable restraint of trade; and (3) an effect on interstate commerce.  15 U.S.C. § 1; *Am. Ad Mgmt., Inc. v. GTE Corp.*, 92 F.3d 781, 788 (9th Cir. 1996).  Courts can find restraints "unreasonable" in two ways: (1) through a "fact-specific assessment of market power and market structure to assess the restraint's actual effect on competition"—known as the "rule of reason;" or (2) by deeming them "unreasonable per se" because the restraints "always or almost always tend to restrict competition and decrease output."  *Ohio v. American Express Co. ("Amex")*, 138 S. Ct. 2274, 2283–84 (2018).  Courts typically reserve summary condemnation under the latter approach for certain horizontal restraints "imposed by agreement between competitors."  *Id.*  Agreements consistently held per se unreasonable include price fixing, output restrictions, market allocations, and certain group boycotts or concerted refusals to deal.  *See, e.g.*, *United States v. Socony-Vacuum Oil Co.*, 310 U.S. 150, 223 (1940) (price fixing); *NCAA v. Oklahoma*, 468 U.S. at 100 (output restrictions); *Palmer v. BRG of Georgia, Inc.*, 498 U.S. 46, 49–50 (1990) (market allocation); *Nw. Wholesale Stationers, Inc. v. Pac. Stationery and Printing Co.*, 472 U.S. 284, 294 (1985) (group boycotts).  Defendant makes three arguments for dismissal of Plaintiff's antitrust claim.  According to Defendant, Plaintiff (i) has not adequately alleged the existence of an agreement, (ii) has not adequately alleged an intent to harm commerce, and (iii) has not adequately alleged a sufficient injury. Defendant is incorrect.

### 1.  Agreement

First, Defendant claims Plaintiff "does not allege any actual agreement between [Defendant] and its distributors regarding [Plaintiff]." Mot. at 5 (internal quotations omitted). As Defendant sees it, Plaintiff's allegations Defendant "conspired with dealers to restrain the sale of ZombieBoxes" are conclusory and unsupported by "evidentiary facts sufficient to answer the fundamental questions of who, did what, to whom (or with whom), where, and when." *Id.* (internal quotations omitted). Plaintiff responds by quoting *Twombly* to assert "[a]sking for plausible grounds to infer an agreement does not impose a probability requirement at the pleading stage; it simply calls for enough fact to raise a reasonable expectation that discovery will reveal evidence of an illegal agreement." Resp. at 8 (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 556 (2007)). Plaintiff argues it has sufficiently pled a conspiracy by alleging Defendant told "distributors it would stop working with them if they continued to work with Plaintiff and the distributors complied." Resp. at 8.

Though Defendant is correct in asserting "an allegation of parallel conduct and a bare assertion of conspiracy is insufficient to plead the existence of a conspiracy or agreement" under the Sherman Act, Mot. at 5–6 (internal quotations omitted), Plaintiff has certainly alleged more than this. The Complaint details the statements Defendant made at the conference, the date and location of the conference, and which distributors were present at the conference. Plaintiff also alleges many distributors stopped doing business with Plaintiff after the conference and Plaintiff even names specific distributors who told Plaintiff they stopped working with Plaintiff because of Defendant's statements or because "Defendant was not okay with" them doing business with Plaintiff. SAC at ¶¶ 35–41, 43–45, 126–30. These allegations are sufficient to plead an agreement at this stage.

### 2. Intent to Harm or Restrain Trade or Interstate Commerce

Second, Defendant argues Plaintiff "fails to allege that Generac intended to harm or restrain trade or interstate commerce." Mot. at 6 (internal quotations omitted). Further, Defendant claims Plaintiff "does not even address this requirement in its response." Reply at 3. But Defendant appears to have misunderstood the claim Plaintiff is asserting.

In its response, Plaintiff explains it is asserting Defendant committed a per se violation by orchestrating a group boycott by distributors of Plaintiff's products. *See* Resp. at 9–10. This type of claim does not require the allegations Defendant claims are necessary.

The Supreme Court in *Klor's*, which Plaintiff cites in its Complaint, explained courts apply per se treatment to horizontal boycotts because they "cripple the freedom of traders and thereby restrain their ability to sell in accordance with their own judgment." *Klor's, Inc., v. Broadway-Hale Stores, Inc.*, 359 U.S. 207, 212 (1959).   In *Klor's*, the plaintiff alleged Broadway-Hale (a department store chain) sought to exclude Klor's (a competing retailer located next door to one of Broadway-Hale's stores), by using its superior buying power to induce manufacturers and distributors of appliances to agree not to sell to Klor's or to do so "only at discriminatory prices and highly unfavorable terms." *Id.* at 208–09.  This agreement took "from Klor's its freedom to buy appliances in an open competitive market" and drove "it out of business as a dealer in the defendants' products." *Id.* at 213.  And it deprived "the manufacturers and distributors of their freedom to sell to Klor's at the same prices and conditions made available to Broadway-Hale." *Id.*  As the Supreme Court explained, this agreement warranted per se condemnation because it had "by its nature and character a monopolistic tendency." *Id.* (internal quotations omitted). "As such, it is not to be tolerated merely because the victim is just one merchant whose business is so small that his destruction makes little difference to the economy." *Id.*

While the boycott Plaintiff alleges involves an agreement among downstream distributors instead of the upstream manufacturers as in *Klor's*, the effect is the same: it deprives Plaintiff of its freedom to sell its products to dealers in the open competitive market and deprives dealers of the freedom to buy and sell Plaintiff's products.  Plaintiff alleged the agreement constitutes a per se violation.

Once a plaintiff plausibly alleges an agreement in the per se context, "no further inquiry into the practice's actual effect on the market or the parties' intentions is necessary to establish a § 1 violation." *In re Musical Instruments & Equip. Antitrust Litig.*, 798 F.3d 1186, 1191 (9th Cir. 2015).  Defendant cites *Kendall v. Visa* as support for contending

1    Plaintiff must allege intent, *see* Mot. at 6, but *Kendall* did not involve a per se claim and is

2    inapposite, *see Kendall v. Visa U.S.A., Inc.*, 518 F.3d 1042 (9th Cir. 2008).  Since Plaintiff

3    has alleged a per se antitrust violation, it need not plead specific intent to harm interstate

4    commerce.

5    ### 3.  Antitrust Injury

6    Finally, Defendant argues Plaintiff "fails to allege the required antitrust injury—*i.e.*,

7    an injury to competition beyond the impact on the claimant."  Mot. at 6 (internal quotations

8    omitted).  But, again, Defendant relies on cases analyzing restraints under the rule of

9    reason, not the per se approach.  Mot. at 6 (citing *McGlinchy v. Shell Chem. Co.*, 845 F.2d

10   802 (9th Cir. 1988) and *Aydin Corp. v. Loral Corp.*, 718 F.2d 897 (9th Cir. 1983)).  It is

11   true, in some cases, Defendant's proffered standard applies.  But where a plaintiff alleges

12   a per se violation, the plaintiff need not prove actual harm to competition.  *See, e.g.*,

13   *Copperweld Corp. v. Indep. Tube Corp.*, 467 U.S. 752, 768 (1984) ("Certain agreements,

14   such as horizontal price fixing and market allocation, are thought so inherently

15   anticompetitive that each is illegal per se without inquiry into the harm it has actually

16   caused."); *Klor's*, 359 U.S. at 211 (finding "Congress had determined its own criteria of

17   public harm" for per se restraints "and it was not for the courts to decide whether an

18   individual case injury has actually occurred").

19   This is not to say antitrust injury plays no part in a per se claim.  Although a plaintiff

20   bringing a per se claim need not prove actual harm to competition, the plaintiff must still

21   show its injury was of the type the antitrust laws intend to prevent.  *See Atl. Richfield Co.

22   v. USA Petroleum Co.*, 495 U.S. 328, 339–40 (1990) ("Antitrust injury does not arise . . .

23   until a private party is adversely affected by an *anticompetitive* aspect of the defendant's

24   conduct . . . . regardless of the type of antitrust claim involved." (emphasis in original)).

25   Defendant conflates the substantive element of injury to competition in a rule of reason

26   claim with the requirement all antitrust plaintiffs must meet by showing they have standing

27   under the antitrust laws.

28   Even though Plaintiff need not show broader harm to competition, the Complaint

alleges Defendant's conduct harms both Plaintiff and "the market as a whole by pushing a manufacturer out of the market." SAC at ¶¶ 134–35. As in *Klor's*, Plaintiff has carried its burden by alleging it has suffered an injury of the type the antitrust laws intend to prevent: the exclusion of a competitor from the market by collusive and anticompetitive agreement.

The Court notes there is some question whether Plaintiff's claim actually involves a per se boycott. To qualify for per se treatment, the alleged boycott agreement must involve at least two horizontal competitors. *See NYNEX Corp. v. Discon, Inc.*, 525 U.S. 128, 135 (1998). But not all horizontal boycotts necessarily qualify for per se treatment. Courts generally reserve summary condemnation for boycotts aimed at a *direct competitor*. *See Nw. Wholesale Stationers, Inc. v. Pac. Stationery & Printing Co.*, 472 U.S. 284, 294 (1985) ("Cases to which this Court has applied the per se approach have generally involved joint efforts by a firm or firms to disadvantage competitors by either directly denying or persuading or coercing suppliers or customers to deny relationships the competitors need in the competitive struggle." (internal quotations omitted)); *F.T.C. v. Indiana Fed'n of Dentists*, 476 U.S. 447, 458 (1986) ("[T]he per se approach has generally been limited to cases in which firms with market power boycott suppliers or customers in order to discourage them from doing business with a competitor."). It is as yet unclear whether Plaintiff is properly considered a direct competitor of Defendant, and though Defendant's Motion notes this distinction in opposing Plaintiff's false advertising claim, *see* Mot. at 7 n.2, Defendant does not make this argument or cite to any of these cases in seeking dismissal of Plaintiff's antitrust claim. Based on the arguments made in Defendant's motion, Defendant's Motion with respect to Plaintiff's antitrust claim (Count VI) will be denied.

## IV.    CONCLUSION

Plaintiff has adequately alleged Defendant made defamatory statements about its product at the 2023 Dealer Conference, interfered with a prospective business relationship with at least one distributor, and orchestrated a group boycott of Plaintiff and its products. These facts are sufficient to state defamation, trade libel, wrongful interference, and

antitrust claims against Defendant at the motion to dismiss stage.  But Plaintiff has failed to state a claim for false advertising.

Accordingly,

**IT IS ORDERED** Defendant's Motion to Dismiss (Doc. 11) is **GRANTED IN PART** and **DENIED IN PART**.  Counts IV and V of Plaintiff's Complaint are **DISMISSED WITH LEAVE TO AMEND**.  If Plaintiff amends, it must file its amended complaint within fourteen days of this Order and Defendant shall respond to that complaint by the deadline required by the Federal Rules of Civil Procedure.  If Plaintiff does not amend, no later than fourteen days of this Order Plaintiff must file a statement setting forth that it will not file an amendment.  If Plaintiff does not file an amended complaint, Defendant shall file its answer to the remaining counts within fourteen days of Plaintiff's statement.

**IT IS FURTHER ORDERED** Defendant's Motion for Judicial Notice (Doc. 13) is **DENIED**.

Dated this 29th day of February, 2024.

Honorable Roslyn O. Silver
Senior United States District Judge