Jonathan A. Dessaules, State Bar No. 019439
Douglas M. Imperi, Jr., State Bar No. 034708
**DESSAULES LAW GROUP**
7243 North 16th Street
Phoenix, Arizona 85020
Tel. 602.274.5400
Fax 602.274.5401
jdessaules@dessauleslaw.com
dimperi@dessauleslaw.com

*Attorneys for Plaintiff*

IN THE UNITED STATES DISTRICT COURT

IN AND FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| ZombieBox International, Inc., a Delaware corporation, | No. CV-23-00726-PHX-ROS |
| Plaintiff, | **THIRD AMENDED COMPLAINT** |
| vs. | **(Jury Trial Demanded)** |
| Generac Power Systems, Inc., a Wisconsin corporation, | |
| Defendant. | |

Plaintiff ZombieBox International, Inc. ("Plaintiff") alleges:

1.      Plaintiff is a for-profit corporation incorporated in Delaware and headquartered in Arizona.

2.      Defendant Generac Power Systems, Inc. ("Defendant") is a for-profit corporation incorporated in Wisconsin.

3.      At all times material to this Complaint, Defendant has continuously done business in Arizona.

4.      Plaintiff has been and is currently doing business in Maricopa County, Arizona and the events alleged in this Complaint have affected Plaintiff's business in Arizona.

5.      Jurisdiction is proper in this Court.

6.      Venue is proper in this Court.

**GENERAL ALLEGATIONS**

7.     Plaintiff has created a revolutionary, patented noise reducing enclosure for portable and standby generators.

8.     The enclosure is called a "ZombieBox", and it can reduce the deafening noise of a generator by approximately 50-75%.

9.     The ZombieBox is weatherproof, durable, collapsible, and easy to set-up.

10.     The ZombieBox includes vents and fans to safely handle the heat and exhaust gases released by a generator. For more heavy-duty generators, Plaintiff offers a proprietary secondary muffler and exhaust, called a "Z-Pipe", that can further help control temperature, gases, and noise.

11.     Plaintiff has extensively tested its products and ran studies to determine whether they are safe.

12.     Plaintiff ran dozens of thermal tests to check any changes to oil and air temperature with and without a Zombiebox. Plaintiff obtained testing probes to ensure its results were accurate. It conducted tests both in its own facilities and out in the field. For any adjustment to the Zombiebox, such as changing the air intake system or installing fans, Plaintiff would perform another thermal test.

13.     Plaintiff found that any impact on the internal temperature of generators was negligible, while the reduction in noise was drastic.

14.     After years of development and testing, Plaintiff started selling its products in 2016 and had some of them patented.

15.     Plaintiff's growth was rapid. It soon had to triple its plant space and double its staff to keep up with demand.

16.     Eventually, Defendant, one of the largest manufacturers of generators in the world, reached out to Plaintiff to discuss a potential partnership that could include testing each other's products together and/or collaboration on new products.

17.     During this time, Plaintiff had direct communications with a handful of Defendant's

employees, including Defendant's President of Power Systems at that time, Jeff Mueller, who informed Plaintiff that Zombiebox did not make their generator's any hotter and they should be good to work together.

18.     The parties discussed working together on thermal testing and Plaintiff offered to give Generac a Zombiebox for that purpose.

19.     The parties' discussions fizzled out and even though Plaintiff attempted numerous times to contact Defendant through his known contacts, nothing came of the relationship.

20.     Plaintiff later learned the direct contacts with Defendant were all no longer associated with Defendant.

21.     Soon after discussions became unproductive, Defendant started making false and defamatory statements to distributors and customers throughout the dealer network concerning Plaintiff and its products.

22.     Specifically, Defendant said that a ZombieBox is dangerous, damages the generators it houses, and voids a generator's warranty.

23.     On August 9, 2018, Matthew Geitner, Defendant's then-Territory Development Manager for the West Coast, emailed Plaintiff's CEO, David Leedy, to tell him: "Well I tried but the VP's denied my request to have you at the dealer conference due to the fact that the [Zombiebox] still voids the warranty on a generator."

24.     Plaintiff has submitted online questions to Defendant regarding the use of a Zombiebox with Defendant's generators. In response to those questions, Defendant has stated:

"Using a zombie box or things like that could possibly damage the unit."

"Our units cannot be in any kind of enclosure. Using a enclosure could compromise the warranty on the unit."

"Sadly we have had lots of test [sic] and other customers whom have used this product it is not something that is reliable for us to give our approval."

"We don't know what test have run but yes from the over [sic] data we have gotten we can not recommend them for any of our products at all."

"No that is dangerous it [sic] not meant for the air-cooled design."

25.     In 2020, Brian Baughman, a Technical Applications Manager for Defendant, made a post on an online forum referring to ZombieBoxes as "generator coffins" and claimed they "will void the listing of the generator and will void all manufacturer and extended warranties."

26.     On April 26, 2021, Brandon Ruybe, Defendant's then-Regional Development Manager for Northern California, Utah, and Nevada, emailed Mr. Leedy: "Sound has been a recent issue that is hindering companies like Schafer to push our products. Now back when I started at Generac in 2016, I heard about your brand on a weekly basis, but as of late it looks like we have hunkered down on safety. This translated through our service team puts pressure on your product, so yes please get in contact with Bob Cramer. . . .Again I cannot make any guarantees, as much as I want a happy middle ground, I have to stand behind my company no matter the decision."

27.     On December 21, 2021, in response to a potential ZombieBox customer's online forum post asking about ZombieBoxes, Mr. Baughman referred to ZombieBoxes as "a casket for your generator. . ."

28.     In or around April 2022, Jesse Dunk, a Technical Application Representative for Defendant emailed Cherie Chavez, the Operations Manager for a Generac dealer, and said: "If someone were to put a Zombie box on the units, it will void the warranty."

29.     On August 1, 2022, Mr. Leedy, emailed Defendant's Technical Application Representative, Jesse Dunk—and sent a carbon copy to Defendant's Assistant General Counsel, Alex Handelsman—with the subject line: "Deceptive statements to the public about Zombiebox" wherein Mr. Leedy asked "What testing has Generac done on our enclosure? To my knowledge, Generac has never tested this product, yet we have evidence where Generac Representatives are telling the dealer network and consumers that these are not safe, and that engineering has tests

proving they affect the generator."

30.     Mr. Leedy also said: "We have done extensive testing and have found no significant data showing the enclosure affects the operation at all. Generac is liable for these statements as they are false and defamatory. Please provide the data that is being cited in its entirety."

31.     Defendant never provided data.

32.     After seven years, and thousands of units sold, Plaintiff has never received a complaint about the safety of its ZombieBox.

33.     Plaintiff is aware of a single instance where a generator housed in a Zombiebox was damaged by heat, but that Zombiebox was installed improperly and backwards (by a Generac dealer)—which led to heat being trapped rather than vented out as it would if the Zombiebox was installed correctly.

34.     Defendant has never conducted its own studies concerning the safety of ZombieBox.

35.     On or about January 17-19, 2023, Defendant hosted its annual dealer conference with many distributors that are part of its trusted network, including Gentek Power LLC, Degryse Electric, and Texas GenPro, in Orlando, Florida.

36.     At this conference, Defendant presented an image of a ZombieBox with a large red X superimposed on it.

37.     At this conference, Defendant referred to the ZombieBox as a "generator murder box."

38.     Defendant presented pictures of a warped generator control panel and attributed it to overheating allegedly caused by a Zombiebox.

39.     Defendant reiterated its claims that ZombieBoxes are dangerous, damage generators, and void warranties—despite having no information whatsoever to back up those claims.

40.     Defendant also told distributors that if they continued to hold or sell ZombieBoxes, Defendant would stop working with those distributors.

41.     Denver Lamont from Gentek Power, Aaron Degryse from Degryse Electric, and James Cooper from Texas GenPro were present for Generac's presentation.

42.     On January 26, 2023, Mr. Leedy emailed Ms. Dunk and said: "What testing has Generac done on our enclosure? To my knowledge, Generac has still never tested this product, yet we have even more evidence via Chats, dealer conversations, and your recent dealer conference where Generac is telling the dealer network and consumers that these are not safe, and that engineering tests proving they affect the generator, and are showing pictures of alleged 'thermal events' caused by a Zombiebox. If you are telling the public you have test data where is it? One warped control panel because your dealer installed the box backwards is not evidence or proof of anything. Please send me the information shared at the dealer conference regarding Zombiebox in it's [sic] entirety including the pictures and details regarding the alleged thermal event."

43.     Defendant never sent any information.

44.     As a direct and proximate result of Defendant's actions, several distributors, including but not limited to Generator Supercenter, LT Generators, Degryse Electric, Sonic Shield, Devine Electric, Texas GenPro, AAAA Generator, Green Day Power, Vital Energy Solar, Ambrose Group, SonoMarin Solar, MEL Electric, Fisher Electric Inc., My Generator Guy, BEI Electrical, Fitch Electric, Moreno Electric, Quattro Solar, Reyf Electric, Macaluso Electric, Bellows Service, Rake Electric, Infinity Electric, Zarco Electrical, PG&E, LoDolce Electric, Abide International, Powerclean California, Century Roof Tile, King Power Systems, SBE Generator, Ride Entertainment, James Meyers Co., Tower Electric, Mohrmann Electric, and Wilson Plumbing have stopped carrying and ordering ZombieBoxes.

45.     Generator Supercenter had previously ordered a ZombieBox prototype that it could put on display for customers. Plaintiff was under the impression that Generator Supercenter

wanted exclusive rights to sell ZombieBoxes. Yet, shortly after Generac started to defame Plaintiff and its products, Generator Supercenter shut off all communication with Plaintiff. Douglas Dixon, the Chief Business Officer for Generator Supercenter told David Leedy that Defendant was not okay with Generator Supercenter working with Plaintiff and that Defendant told Generator Supercenter that the ZombieBox will void Defendant's warranty.

46.     Plaintiff worked directly with LT Generators to test Plaintiff's products and refine them to improve air flow and acoustics. Plaintiff's CEO, David Leedy, flew out to California to oversee load tests and ensure Plaintiff's product worked as advertised. The results were great. After six hours of testing, there was hardly any change to the internal temperature of the generator tested. LT Generators even posted a video of the testing on their website. However, after Generac started to defame Plaintiff and its products, LT Generators shut off all communication with Plaintiff and pulled the test video from its website.

47.     James Cooper from Texas GenPro also told Mr. Leedy how Defendant said a ZombieBox will definitely void the warranty on Defendant's generator. Texas GenPro was required to disclose this information to customers, which killed most ZombieBox sales.

48.     Other distributors, like Schafer Electric Generator, Genetech, Point Loma Electric, and GenerX Fixmygen.com have indicated that they will likely stop carrying and ordering ZombieBoxes.

49.     Several distributors said they believed Defendant's false and deceptive claims that ZombieBox would void warranties and were unsafe.

50.     On April 4, 2022, the owner of Degryse Electric, Aaron Degryse, emailed Mr. Leedy and said: "Generac 100% does not warranty the generator if it its installed in a Zombie box. In fact they tell the cities and counties to watch out for the zombie box and not approve the install if one was used."

51.     On October 20, 2022, Justin Chandler, from Chandler Electric, emailed Plaintiff to say: "Please see Generac's installation guidelines. [The ZombieBox] will void any home standby Generac generator warranty, and likely cause overheating. I truly wish we could use it."

52.     Another dealer, Austin Generator Service, emailed Plaintiff on October 27, 2022, to say: "Is this product [ZombieBox] approved by Generac and Kohler? I ask because it seems like it could potentially void the manufacturer's warranty if it is not approved."

53.     In late 2022, Plaintiff was in communication with Schultz Miller, a homebuilder, about a continuing relationship where Schultz Miller would use Plaintiff's product on new builds. Schultz Miller had several immediate projects where it wanted to use Plaintiff's products. However, Schultz Miller eventually raised warranty concerns and withdrew from further discussions.

54.     One of Generac's authorized dealers, Ziller Electric, has made online forum posts about ZombieBoxes, stating "Generac would void your warranty. It is simply not allowed."

55.     Consumers have made posts online about ZombieBox stating "Zombieboxes and anything similar are almost always a surefire way to void your warranty. Generac hates them and with good reason in my opinion, they're known to restrict airflow and cause overheating issues." https://www.reddit.com/r/Generator/comments/10rb75v/standby_shed_or_enclosure/ (last accessed March 9, 2023).

56.     Some customers have reached out directly to Plaintiff to tell them Defendant and Defendant's dealers are spreading Defendant's defamatory statements.

57.     On November 7, 2022, a potential customer, Thomas Brown, responded to Plaintiff's email about its products and said: "Thanks for getting back to me so quickly. My contractor told me the enclosure would void my warranty with Generac."

58.     On November 16, 2022, a potential customer, Sonia Gerard DeGuelle, in response to Plaintiff's emails about its products, said: "Thank you for your email. We're looking into

alternatives for reducing the generator noise as we were informed by Generac that protecting our generator with Zombie Box would void our warranty."

59.     On November 21, 2022, another potential customer, Gary Andersen, emailed Plaintiff and said that his local generator supplier does not recommend the ZombieBox because "it can cause excessive heat and void the generator warranty."

60.     On January 11, 2023, a potential customer, Shane, emailed Plaintiff stating: "Just FYI. Generac says the Zombie Box will void their warranty. I'm not going to proceed because of that."

61.     On February 21, 2023, another potential customer, Jim Lapp emailed Plaintiff to say: "My Generac supplier believes [a ZombieBox's] use will void the warranty."

62.     The resulting decline in Plaintiff's business has been precipitous.

63.     Since Defendant began defaming Plaintiff, Plaintiff's sales have dropped significantly each year.

**COUNT I**
**(Defamation)**

64.     Plaintiff realleges and incorporates the foregoing paragraphs of this Complaint as if fully set forth herein.

65.     Defendant communicated, published, and disseminated or caused to be communicated, published, and disseminated false, misleading, malicious, and outrageous statements by written and oral communications as set forth above to countless third parties which Defendant knew, or should have known, were false, misleading, malicious, and outrageous.

66.     Defendant's defamatory statements include:

      i.   In April 2022, Defendant's Technical Application Representative, Jesse Dunk, emailed Cherie Chavez, the Operations Manager for Degryse Electric Inc., and said: "If someone were to put a Zombie box on the units, it will void the warranty."

9

      ii.  In November 2022, Defendant told Sonia DeGuelle that protecting her generator with a Zombie Box would void her warranty.

      iii.  During Defendant's 2023 Annual Dealer Conference in Orlando, Florida it made a presentation to dealers where it referred to the Zombiebox as a "generator murder box"; falsely attributed a generator's heat damage to a ZombieBox; and told dealers that ZombieBoxes were dangerous, damage generators, and void warranties.

67. Defendant knows or should know these statements are false, misleading, malicious, and outrageous.

68. The only evidence it has regarding the safety of ZombieBoxes is the data Plaintiff provided, which shows they are safe to use. It has no other evidence to show ZombieBoxes are dangerous or damage generators. If ZombieBoxes do not damage generators, then they cannot void Defendant's warranty.

69. The defamatory statements were the direct and proximate cause of damage to Plaintiff's business reputation and its ability to conduct business.

70. The defamatory statements damaged Plaintiff by making it the object of public scorn, ridicule, contempt, disgrace, and hatred.

71. Defendant communicated, published, and disseminated such written and oral false and defamatory statements with actual malice, either with the knowledge that such statements were false or with reckless disregard of whether such statements were false.

72. Said false and defamatory statements were neither privileged nor consented to by Plaintiff.

73. The defamatory communications pertaining to Plaintiff and its patented product, ZombieBox, are defamatory by virtue of the way they portray Plaintiff as providing an inferior product which is dangerous and voids warranties.

74. The defamatory statements made by Defendant were accomplished with malice.

75.     Plaintiff is a private figure and the defamatory statements made by Defendant relate to matters of private concern. Defendant's defamatory per se statements are therefore presumed false, and Plaintiff is therefore entitled to recover presumed damages as well as compensatory and special damages.

76.     As a result of Defendant's communication, publication, and dissemination of such false and defamatory statements, Plaintiff has suffered, and continues to suffer, public contempt, ridicule, degradation, severe outrage, and actual pecuniary damages to its business reputation.

77.     Defendant's statement to consumers that a "ZombieBox" will necessarily void the warranty of a Generac Generator is wrongful and violates the Magnuson-Moss Warranty Act prohibition on conditioning its warranty on the consumer's use of another's products. *See* 15 U.S.C. § 2302(c).

## COUNT II
### (Trade Libel/Commercial Disparagement)

78.     Plaintiff realleges and incorporates the foregoing paragraphs of this Complaint as if fully set forth herein.

79.     Defendant published false statements of fact about Plaintiff's business, including claims that Plaintiff's products are dangerous and necessarily void warranties.

80.     These false statements include:

     i.   In April 2022, Defendant's Technical Application Representative, Jesse Dunk, emailed Cherie Chavez, the Operations Manager for Degryse Electric Inc., and said: "If someone were to put a Zombie box on the units, it will void the warranty."

     ii.   In November 2022, Defendant told Sonia DeGuelle that protecting her generator with a Zombie Box would void her warranty.

     iii.   During Defendant's 2023 Annual Dealer Conference in Orlando, Florida it made a presentation to dealers where it referred to the Zombiebox as a

"generator murder box"; falsely attributed a generator's heat damage to a ZombieBox; told dealers that ZombieBoxes were dangerous, damage generators, and void warranties; and placing a large red X on a picture of a ZombieBox to indicate to dealers to steer clear.

81.     Defendant knew these statements were false or recklessly disregarded that these statements were false.

82.     Defendant intended or reasonably believed that its statements would cause Plaintiff to lose customers and suffer financial losses.

83.     Plaintiff actually suffered a loss of customers and financial losses due to Defendant's statements.

84.     Defendant's conduct in publishing such false and defamatory statements concerning Plaintiff's products and business, was committed with a conscious disregard for the rights of Plaintiff and was of such a willful, wanton, and intentional nature as to justify the imposition of substantial exemplary and punitive damages both as a punishment for their actions and so that others will henceforth be deterred from similar conduct.

85.     Defendant's statement to consumers that a "ZombieBox" will necessarily void the warranty of a Generac Generator is wrongful and violates the Magnuson-Moss Warranty Act prohibition on conditioning its warranty on the consumer's use of another's products. *See* 15 U.S.C. § 2302(c).

**COUNT III**
**(Wrongful Interference with Existing and Prospective Contractual Relations)**

86.     Plaintiff realleges and incorporates the foregoing paragraphs of this Complaint as if fully set forth herein.

87.     Defendant's conduct as described above constitutes intentional interference with the contractual relationships between Plaintiff and its distributors and customers, as well as an

interference with Plaintiff's economic relationships, prospective economic relationships, and advantages with both Plaintiff's existing and potential distributors, customers, and/or third parties.

88.     Defendant knew about Plaintiff's existing and potential relationships. For example:

    i.   On December 21, 2021, Defendant's Technical Applications Manager, Brian Baughman, knew a prospective buyer was inquiring about ZombieBoxes for the purpose of purchasing one when he referred to ZombieBoxes as "a casket for your generator. . ."

    ii.   In April 2022, Defendant's Technical Application Representative, Jesse Dunk, knew Degryse Electric Inc. was inquiring about ZombieBoxes for the purpose of buying them and selling them to customers when it told Cherie Chavez, Degryse's Operations Manager, that: "If someone were to put a Zombie box on the units, it will void the warranty."

    iii.   Defendant's statement to dealers that it will stop working with them if they continue to work with ZombieBox would not make any sense if Defendant was not aware of Plaintiff's existing economic relationships with Defendant's dealers.

    iv.   Defendant knew prospective customers like Sonia DeGuelle and Shane were inquiring about ZombieBoxes for the purpose of purchasing one when it told them a ZombieBox will void their warranty.

89.     Such interference was wrongful because, among other things, Defendant knew its representations were false, Defendant made these representations for the purpose of harming Plaintiff's sales, and Defendant's conduct harmed a societal interest in preserving freedom of commerce.

90.     Plaintiff had existing and ongoing relationships with several dealers that completely stopped ordering Plaintiff's products because of Defendant's interference.

91.     Plaintiff had prospective contractual relationships with vendors, like Schultz Miller, Degryse Electric, Generator Supercenter, and LT Generators, which ended because of Defendant's defamatory statements.

92.     Plaintiff also had prospective contractual relationships with consumers who indicated that Defendant's statements were the reason they would not make a purchase from Plaintiff.

93.     As a result of Defendant's conduct interfering with Plaintiff's contractual and economic relationships, and prospective economic relationships, Plaintiff has suffered damages in an amount to be determined at trial.

94.     Defendant's conduct in interfering with Plaintiff's contractual relationships and Plaintiff's economic relationships and advantages, as well as its prospective economic relationships and advantages, was committed with a conscious disregard for the rights of Plaintiff and was of such a willful, wanton, and intentional nature as to justify the imposition of substantial exemplary and punitive damages both as a punishment for their actions and so that others will henceforth be deterred from similar conduct.

**COUNT IV**
**(False Advertising in Violation of the Lanham Act 15 U.S.C. § 1125(a)(1)(B))**

95.     Plaintiff realleges and incorporates the foregoing paragraphs of this Complaint as if fully set forth herein.

96.     The Supreme Court of the United States determined whether a plaintiff has standing to sue under the Lanham Act, depends on: (1) whether the plaintiff's interests "fall within the zone of interests protected by the law invoked" (the "zone of interests" test); and (2) whether the defendant's actions have proximately caused the plaintiff's injuries ("proximate cause"). *Lexmark Intern., Inc. v. Static Control Components, Inc.*, 572 U.S. 118 (2014).

97.     The Lanham Act does not require the parties to be direct competitors. *Id.* (rejecting "direct-competitor test" and finding a chip manufacturer had standing to sue against a printer manufacturer even though the parties were not direct competitors).

98.     Defendant and Plaintiff engage in the business of manufacturing, promoting, and selling generator enclosures.

99.     Defendant's generator enclosures are attached to its generators and Plaintiff's products are standalone enclosures.

100.    Both parties' products serve the purpose of protecting a generator from weather—with Plaintiff's product having the added benefit of noise reduction.

101.    Customers seeking to purchase a generator may opt for Plaintiff's product, along with a generator from one of Defendant's other competitors, rather than a generator and attached enclosure from Defendant.

102.    Defendant has falsely and deceptively advertised through interstate commerce using the internet and mailings to portray ZombieBoxes as dangerous, inferior, and a liability. Defendant has repeatedly and falsely claimed that ZombieBoxes will void a generator's warranty.

103.    Specifically, Defendant has made the following false and deceptive statements:

    i.   In 2020, Defendant's Technical Applications Manager, Brian Baughman, posted on an online forum referring to ZombieBoxes as "generator coffins" and claimed they "will void the listing of the generator and will void all manufacturer and extended warranties."

    ii.  On December 21, 2021, Mr. Baughman posted on an online forum referring to ZombieBoxes as "a casket for your generator. . ."

    iii. In April 2022, Defendant's Technical Application Representative, Jesse Dunk, emailed Cherie Chavez, the Operations Manager for Degryse Electric Inc., and said: "If someone were to put a Zombie box on the units, it will void the warranty."

iv.  In November 2022, Defendant told Sonia DeGuelle that protecting her generator with a Zombie Box would void her warranty.

v.  In 2022, Defendant told Aaron Degryse that it will not warranty a generator if it is installed in a ZombieBox. It also told cities and counties to watch out for ZombieBoxes and not approve generator installations if one is installed.

vi.  During Defendant's 2023 Annual Dealer Conference in Orlando, Florida, Defendant made a presentation to dealers where it referred to the ZombieBox as a "generator murder box"; falsely attributed a generator's heat damage to a Zombiebox; told dealers that ZombieBoxes were dangerous, damage generators, and void warranties; and placing a large red X on a picture of a ZombieBox to indicate to dealers to steer clear.

104.  Defendant directed these advertisements to distributors, consumers, and the public.

105.  Defendant made many of the above statements in connection with advertising and promoting its own products, including hosting a conference for preferred dealers specifically to encourage them to purchase Defendant's products.

106.  Defendant's purpose in making the above statements was to promote the sale of its own products by portraying its products as safe and reliable in comparison to Plaintiff's products.

107.  Defendant made the above statements for the purpose of dissuading dealers and customers from buying Plaintiff's standalone enclosures, and another competitor's generator, so they would buy Defendant's generator with an enclosure.

108.  Defendant's claims are false since: (1) ZombieBoxes have been extensively tested and have been proven to be safe; (2) Defendant has no studies or data showing ZombieBoxes are unsafe; (3) neither Defendant nor Plaintiff have received any report or complaint that a ZombieBox has created a safety issue; and (4) there is nothing inherent about a ZombieBox that will void a warranty.

109.    Defendant's claims had the tendency to deceive a substantial segment of the target audience, Defendant intended that it deceive the target audience, and it did in fact deceive the target audience.

110.    Because Defendant's false claims concerned health, safety, and inherent characteristics of the products at issue, consumers necessarily found them to be material.

111.    Further, the facts show that consumers in fact found Defendant's false claims to be material to their purchasing decisions. Among other things, distributors and customers stopped making orders for Plaintiff's products.

112.    Defendant's false claims eroded Plaintiff's goodwill among consumers and caused Plaintiff's customers and prospective customers to cease doing business with Plaintiff.

113.    Instead, consumers chose Defendant's generators with competing in-house enclosures. This led to a substantial loss to Plaintiff's business, while Defendant benefited.

114.    Therefore, Plaintiff seeks an award that accounts for Defendant's gains, profits, and advantages derived by Defendant from the above-described wrongful acts and treble damages under the Lanham Act.

115.    Plaintiff also seeks an award that compensates it for all the business it lost due to Defendant's false and deceptive advertising.


**COUNT V**
**(Unfair Competition/False Advertising under Arizona State Law)**

116.    Plaintiff realleges and incorporates the foregoing paragraphs of this Complaint as if fully set forth herein.

117.    Arizona recognizes the common law doctrine of "unfair competition," which includes the tort theory of false advertising.

118.    "Unfair competition" does not require the parties to be competitors. *Lexmark*, 572 U.S. at 136.

119.   A person or entity is liable for false advertising where they make a representation relating to the goods of another that is likely to deceive or mislead prospective purchasers to the likely commercial detriment of the other.

120.   Defendant and Plaintiff engage in the business of manufacturing, promoting, and selling generator enclosures.

121.   Defendant's generator enclosures are attached to its generators and Plaintiff's products are standalone enclosures.

122.   Both parties' products serve the purpose of protecting a generator from weather—with Plaintiff's product having the added benefit of noise reduction.

123.   Customers seeking to purchase a generator may opt for Plaintiff's product, along with a generator from one of Defendant's other competitors, rather than a generator and attached enclosure from Defendant.

124.   Defendant has falsely and deceptively advertised that ZombieBoxes are dangerous, inferior, and a liability. Defendant has repeatedly and falsely claimed that ZombieBoxes will void a generator's warranty.

125.   Specifically, Defendant has made the following false and deceptive statements:

   i.   In 2020, Defendant's Technical Applications Manager, Brian Baughman, posted on an online forum referring to ZombieBoxes as "generator coffins" and claimed they "will void the listing of the generator and will void all manufacturer and extended warranties."

   ii.   On December 21, 2021, Mr. Baughman posted on an online forum referring to ZombieBoxes as "a casket for your generator. . ."

   iii.   In April 2022, Defendant's Technical Application Representative, Jesse Dunk, emailed Cherie Chavez, the Operations Manager for Degryse Electric Inc., and said: "If someone were to put a Zombie box on the units, it will void the warranty."

iv.   In November 2022, Defendant told Sonia DeGuelle that protecting her generator with a Zombie Box would void her warranty.

v.   In 2022, Defendant told Aaron Degryse that it will not warranty a generator if it is installed in a ZombieBox. It also told cities and counties to watch out for ZombieBoxes and not approve generator installations if one is installed.

vi.   During Defendant's 2023 Annual Dealer Conference in Orlando, Florida it made a presentation to dealers where it referred to the ZombieBox as a "generator murder box"; falsely attributed a generator's heat damage to a ZombieBox; told dealers that ZombieBoxes were dangerous, damage generators, and void warranties; and placing a large red X on a picture of a ZombieBox to indicate to dealers to steer clear.

126.   Defendant directed these advertisements to distributors, consumers, and the public.

127.   Defendant made many of the above statements in connection with advertising and promoting its own products, including hosting a conference for preferred dealers specifically to encourage them to purchase Defendant's products.

128.   Defendant's purpose in making the above statements was to promote the sale of its own products by portraying its products as safe and reliable in comparison to Plaintiff's products.

129.   Defendant made the above statements for the purpose of dissuading dealers and customers from buying Plaintiff's standalone enclosures, and another competitor's generator, so they would buy Defendant's generator with an enclosure.

130.   Defendant's claims are false since: (1) ZombieBoxes have been extensively tested and have been proven to be safe; (2) Defendant has no studies or data showing ZombieBoxes are unsafe; (3) neither Defendant nor Plaintiff have received any report or complaint that a ZombieBox has created a safety issue; and (4) there is nothing inherent about a ZombieBox that will void a warranty.

131.    Defendant's claims had the tendency to deceive a substantial segment of the target audience, Defendant intended that it deceive the target audience, and it did in fact deceive the target audience.

132.    Because Defendant's false claims concerned health, safety, and inherent characteristics of the products at issue, consumers necessarily found them to be material.

133.    Further, the facts show that consumers in fact found Defendant's false claims to be material to their purchasing decisions. Among other things, distributors and customers stopped making orders for Plaintiff's products.

134.    Defendant's false claims eroded Plaintiff's goodwill among consumers and caused Plaintiff's customers and prospective customers to cease doing business with Plaintiff.

135.    Instead, consumers chose Defendant's generators with competing in-house enclosures. This led to a substantial loss to Plaintiff's business, while Defendant benefited.

136.    Therefore, Plaintiff seeks an award of compensatory damages in an amount to be proven at trial.

**COUNT VI**
**(Restraint of Trade in Violation of Section 1 of the Sherman Act)**

137.    Plaintiff realleges and incorporates the foregoing paragraphs of this Complaint as if fully set forth herein.

138.    Under the Sherman Act, any contract or conspiracy in restraint of trade or commerce is illegal.

139.    As described above, Defendant conspired with dealers to restrain the sale of ZombieBoxes.

140.    Specifically, Defendant would stop selling its products to dealers if they continued working with Plaintiff.

141.    Defendant intended this conduct to harm Plaintiff's sales and knew that its statements would have this immediate effect.

142.   As a direct result of Defendant's conduct, many dealers did in fact stop working with Plaintiff, thereby, furthering the conspiracy and harming Plaintiff.

143.   Dealers, like Generator Supercenter and Texas GenPro, have indicated to Plaintiff that they stopped working with Plaintiff because of statements from Defendant.

144.   Defendant initiated a group boycott of Plaintiff's products, which was completed when the dealers stopped working with Defendant.

145.   Defendant's conduct was not solely unilateral conduct concerning its own personal refusal to buy Plaintiff's products. It was coordinated conduct meant to restrain the decisions of its dealers regarding Plaintiff and Plaintiff's products.

146.   Group boycotts are anti-competitive and constitute an anti-trust violation. *Klor's, Inc. v. Broadway-Hale Stores, Inc.*, 359 U.S. 207 (1959) ("Group boycotts, or concerted refusals by traders to deal with other traders, have long been held to be in the forbidden category."); *U.S. v. General Motors Corp.*, 384 U.S. 127, 146 (1966) (". . . where businessmen concert their actions in order to deprive others of access to merchandise which the latter wish to sell to the public, we need not inquire into the economic motivation underlying their conduct.")

147.   Defendant's conduct was intended to harm or unreasonably restrain Plaintiff from the market for its goods.

148.   Defendant's conduct injured not just Plaintiff, but the market as a whole by pushing a manufacturer out of the market.

149.   Plaintiff is the proper party to bring this action because it was directly harmed by Defendant's anti-competitive conduct.

150.   Under 15 U.S.C. § 15(a), Plaintiff is entitled to recover three times its damages, the costs of suit, and reasonable attorneys' fees.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff demands and prays for judgment as follows:

(A)   An award of injunctive relief ordering that:

i.   Defendant, its officers, agents, servants, employees, and all persons in active concert or participating with them, be preliminarily and permanently restrained, and enjoined from further disseminating the false and deceptive claims described herein in any form or medium;

ii.  Defendant withdraw and retrieve all offending communications from the marketplace;

iii. Defendant disseminate corrective communications to dispel the false and deceptive messages described herein; and

iv. Defendant refrain from any conduct meant to discourage vendors or consumers from ordering from Plaintiff.

(B)     An award of compensatory damages in an amount to be determined at trial;

(C)     An award to Plaintiff for: (1) lost profits; (2) lost enterprise value; (3) out-of-pocket expenses to restore its image; and (4) a percentage of profits Defendant wrongfully gained at Plaintiff's expense;

(D)     An award of exemplary and punitive damages;

(E)     An award of pre- and post-judgment interest;

(F)     An award of Plaintiff's costs and attorneys' fees; and

(G)     Such other relief as the Court deems appropriate.

DATED this 12th day of March 2024.

DESSAULES LAW GROUP

By:   /s/ Douglas M. Imperi, Jr.
Jonathan A. Dessaules
Douglas M. Imperi, Jr.
*Attorneys for Plaintiff*

1

## **CERTIFICATE OF SERVICE**

2   I hereby certify that on March 12, 2024, I electronically transmitted the attached document to the

3   Clerk's Office using the CM/ECF system for filing and for transmittal of Notice of Electronic

4   Filing to all CM/ECF registrants of record.

5

6    /s/ Valerie Kennedy

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26